UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

DARLENE M. ALLEN,

                                        Plaintiff,

            v.                                                    6:05-CV-0101
                                                                  (NAM/GJD)
JO ANNE B. BARNHART,
Commissioner of Social Security,

                                        Defendant.
_____

APPEARANCES:                           OF COUNSEL:

OLINSKY, SHURTLIFF LAW FIRM            HOWARD OLINSKY
Attorneys for Plaintiff

GLENN T. SUDDABY                       WILLIAM H. PEASE
United States Attorney for the        Assistant U.S. Attorney
  Northern District of New York
Attorney for Defendant

GUSTAVE J. DI BIANCO, United States Magistrate Judge

## REPORT-RECOMMENDATION

    Plaintiff commenced this action pursuant to 42 U.S.C. § 405(g) to review the

final decision of the Commissioner of Social Security, which denied her application

for Supplemental Security Income (SSI) Benefits.

## PROCEDURAL HISTORY

    Plaintiff filed an application for SSI benefits on February 28, 2002, alleging

that she became disabled on December 1, 1998. (Administrative Transcript ("Tr") at

41-45).  The application was denied on May 21, 2002.  (Tr. 23-25).  Plaintiff

requested a hearing before an Administrative Law Judge (ALJ) which was held on

March 17, 2003. (Tr. 255-96).  On May 20, 2003, the ALJ issued a decision denying

benefits.  (Tr. 11-17).  The ALJ's decision became the final decision of the

Commissioner when the Appeals Council denied plaintiff's request for review on

January 7, 2005.  (Tr. 4-6).

## CONTENTIONS

Plaintiff raises the following claims:

1.    The ALJ did not properly assess plaintiff's residual functional capacity. (Plaintiff's Brief at 8-10).

2.    The ALJ failed to properly assess the treating physicians' opinions. (Plaintiff's Brief at 10-11).

2.    The ALJ failed to properly assess plaintiff's credibility. (Plaintiff's Brief at 14-16).

4.    The ALJ improperly relied upon the vocational expert's testimony. (Plaintiff's Brief at 12-14).

Plaintiff argues that the ALJ's decision should be reversed, and she should be

awarded benefits.  Defendant argues the Commissioner's decision is supported by

substantial evidence and the complaint should be dismissed.

## FACTS

**1.    Non-Medical Facts**

During the hearing, plaintiff testified that she was 39 years old and lived with

her husband, seven year old son, and thirteen year old daughter. (Tr. 261).  Plaintiff

was a high school graduate and worked as a childcare provider between November

1997 and October 1999. (Tr. 48).[1]  Plaintiff testified she was able to do laundry, clean, cook, grocery shop, and drive a car four times a week. (Tr. 263-64).  Plaintiff also stated that she could sit for thirty minutes, stand for forty-five minutes, walk for thirty minutes, and lift between fifteen and twenty pounds.  (Tr. 266-67).[2]

## 2.     Medical Evidence

Plaintiff claims disability based upon fibromyalgia, myofascial pain syndrome, and post-traumatic stress disorder (PTSD).  (Tr. 47).  The medical evidence includes treating source records, examining physician opinions, non-examining physician assessments, and medical test results.

### A.     Treating Physicians

Plaintiff's alleges that she suffers from sharp constant pain in her lower back and hip that radiates to her right leg.  (Tr. 275-77).  Plaintiff states that the pain results from a 1988 injury sustained when she fell off a bike. (Tr. 105, 275).  Dr. Finkenstadt and Dr. Sobhy have treated plaintiff for pain.

### 1. Dr. Finkenstadt

Dr. Finkenstadt treated plaintiff on a nearly monthly basis between March 2000 and December 2000. (Tr. 82, 83, 87, 90, 92, 93, 95).  During each visit plaintiff had "prolotherapy" injections. *Id*.  On March 17, 2000, Dr. Finkenstadt administered the

---

[1]The court notes plaintiff testified that she worked as a childcare provider for only one year, (Tr. 273-74), but completed a disability report indicating she worked from November 1997 to October 1999.  (Tr. 48).

[2]The court notes plaintiff originally stated she could walk for ten minutes, but then stated she could walk thirty minutes.  (Compare Tr. 266, 267).

first injection. (Tr. 95). At that time, Dr. Finkenstadt noted that plaintiff could bend forward to 70 degrees and backward to 10-15 degrees. (Tr. 95). At the time of plaintiff's last treatment in December 2000, Dr. Finkenstadt stated that plaintiff could bend forward to 80 degrees and backward to 10 degrees. (Tr. 82). In December 2000, Dr. Finkenstadt also noted plaintiff was not using pain medications and had not received chiropractic treatment since July 2000. (Tr. 82).

Throughout plaintiff's treatment, Dr. Finkenstadt indicated plaintiff's back was ***not the reason*** plaintiff was out of work. (Tr. 82 (March 2000), 87 (April 2000), 93 (August 2000), 95 (December 2000)). In Dr. Finkenstadt's March 17, 2000 report he stated that plaintiff had a "mild to moderate partial disability." (Tr. 95). In April 2000, Dr. Finkenstadt opined plaintiff was "[n]ot working per her choice." (Tr. 93). The only limitation noted by the doctor was to "[a]void heavy lifting." (Tr. 93).

### 2. **Dr. Sobhy**

Plaintiff's family physician, Dr. Fairbanks-Doane, referred plaintiff to Dr. Sobhy for pain management. (Tr. 107, 129). On April 9, 2001, during Dr. Sobhy's first evaluation, plaintiff had normal range of motion of most joints, except for her cervical and lumbar spine range of motion which produced "minimal tenderness" at the end of ranges. (Tr. 130). Gait and muscle tone were both normal. (Tr. 130). Palpation of the cervical paraspinal and the upper and middle fibers of the trapezius muscles produced pain with multiple trigger points. (Tr. 130). However, plaintiff could tiptoe, heel/toe walk, and squat without difficulty. (Tr. 130).

Dr. Sobhy diagnosed myofascial pain syndrome involving the cervical

paraspinal muscles as well as the upper and middle trapezius muscles. (T. 131).  He

also diagnosed mechanical low back syndrome. (T. 131).  Dr. Sobhy's plan was to

rule out cervical neuropathy or other nerve entrapment. (T. 131). On April 23, 2001,

Dr. Sobhy performed an electrophysiological study and found no evidence of

neuropathy, radiculopathy, plexopathy, or myopathy.[3]  (Tr. 121).  Dr. Sobhy's plan

for pain management included exercise, medication, and physical therapy. (Tr. 131).

In February 2002, Dr. Sobhy stated that plaintiff's physical examination

showed a reduction of the range of motion in her cervical spine with tenderness at the

end of the ranges, however, her lumbar range of motion "showed significant

improvement following the epidural injections." (Tr. 119).  Dr. Sobhy also stated that

plaintiff "walks as much as possible." (Tr. 119).  Muscle testing showed some

reduction in the force of contraction of all the muscles in both upper limbs,

"secondary to pain inhibition." (T. 119).  Dr. Sobhy suggested to plaintiff that she

incorporate "more fun activities" into her daily schedule, and that this would "benefit

her as a form of physical therapy." (Tr. 119).

In April 2002, Dr. Sobhy's physical examination revealed reduced range of

motion of the cervical and lumbar spine with tenderness at the mid-ranges. (Tr. 210).

Manual muscle testing showed the same reduction in the force of contraction as the

doctor found in his previous examination. (Tr. 210).  Plaintiff's upper body sensation

was also reduced. (Tr. 210).  Additionally, Dr. Sobhy noted plaintiff had stopped

---

[3]The Court notes that Dr. Sobhy's electrophysiological study report appears twice in the
record.  (Tr. 120-21, 122-23).  The copies appear to be different drafts of the same report as one is
dated April 23, 2001, (Tr. 120), and the other is dated April 18, 2001.  (Tr. 122).

taking thyroid medication without "clear reason."  (Tr. 210).  He was concerned about regulating plaintiff's drug regimen prior to considering further epidural injections. (Tr. 210).

On February 19, 2003, Dr. Sobhy stated plaintiff had "been doing fairly well regarding her pain and that ***has been under control for years***." (Tr. 211)(emphasis added).  Dr. Sobhy stated that although plaintiff still had some generalized aches and pains that were bothering her, she was "doing quite well as a whole." (Tr. 211).  Dr. Sobhy's physical examination revealed plaintiff to have 5/5 strength in all muscle groups. (Tr. 211). Dr. Sobhy noted that plaintiff was currently seeing a therapist, Dr. Jennifer L. Wainman-Sauda. (Tr. 211).  Dr. Sobhy stated that therapist Wainman-Sauda asked Dr. Sobhy if he would try treating plaintiff without medication, and Dr. Sobhy agreed to discontinuing her drug regimen. (T. 211).

Dr. Sobhy completed an undated "physical medical source statement," opining plaintiff's neck and low back pains were "severe." (Tr. 230, 230-34).  Dr. Sobhy concluded "pain limit[ed]" plaintiff, but did not state how severely the pain limited plaintiff's ability to function.  (Tr. 234).  Dr. Sobhy did not indicate any functional limitations and instead suggested a functional capacity evaluation (FCE) be completed.  (Tr. 231-33).

### 3.  **Test Results**

Plaintiff underwent MRI tests in September 1998 and April 2001.  The September 1998 MRI was "otherwise normal" except for "very mild" circumferential bulging of L4-5 and L5-S1 intervertebral discs. (Tr. 99).  Two MRI's were taken in

April 2001.  (Tr. 110, 111).  An MRI of the right hip and pelvis was normal except for a two centimeter right ovarian cyst.  (Tr. 110).  An MRI of the lumbar spine revealed "minimal disc narrowing and desiccation," normal canal and foraminal stenosis results, and "more extensive disc and bony degenerative change from T7 through T12."  (Tr. 111).

### 4.  Mental Treating Sources

Plaintiff testified that she had never been treated by a psychologist or a psychiatrist, (Tr. 266-69), but had been treated by therapist Dan Childers, from the Onondaga Pastoral Counseling Center, and by therapist Wainman-Sauda.  (Tr. 272).  Plaintiff testified that therapist Childers had treated her for five and a half years and therapist Wainman-Sauda had treated her for five years.[4]  (Tr. 273).

Plaintiff was admitted, as an outpatient, to the Onondaga Pastoral Counseling Center (OPCC) in August 1997. (Tr. 179-84).  Upon admission, plaintiff was diagnosed with dysthymic disorder[5] and had a GAF score of 53.[6]  (Tr. 182, 184).  Aside from the admission note, the remainder of the OPCC records are periodic

---

[4]The court notes that the record contains at least four different indications of when plaintiff began treatment with therapist Wainman-Sauda.  In March 2003, plaintiff testified that therapist Wainman-Sauda had treated her for five years.  (Tr. 273).  Plaintiff's disability report indicated therapist Wainman-Sauda first treated her in June 1999.  Therapist Wainman-Sauda indicated plaintiff began treatment in July 2000, (Tr. 132), and November 2000.  (Tr. 141).

[5] Dysthymic disorder is characterized by a "[d]epressed mood for most of the day, for more days than not" for two years.  *See Generally*, American Psychiatric Association, <u>Diagnostic and Statistical Manual of Mental Disorders</u> 376-381 (4th Ed., text revision 2000).

[6] GAF is an acronym for the Global Assessment of Functioning (GAF) Scale.  *See Generally*, American Psychiatric Association, <u>Diagnostic and Statistical Manual of Mental Disorders</u> 34 (4th Ed., text revision 2000).  The admission note is signed by a psychiatrist with a non-discernable signature and by Paul Hughes, CSW, a therapist.  (Tr. 184).

treatment reviews conducted on three month intervals between December 1997 and April 2002.[7] (Tr. 186-209). The periodic reviews indicate therapist Childers, CSW, MSW was treating plaintiff on a weekly basis. (Tr. 189, 193, 195, 197). All of the periodic reviews diagnose plaintiff with dysthymic disorder. (Tr. 186-209).

On June 4, 1998, therapist Childers noted that plaintiff was able to take time for herself, away from her children, to obtain counseling and "required job training." (Tr. 188). Therapist Childers also noted that plaintiff's progress had been limited due to her inability to attend sessions without her partner and her children in the next room. (Tr. 188). This situation increased plaintiff's distraction because her family would interrupt the session. (Tr. 188).

On January 4, 1999, therapist Childers stated that plaintiff had made progress since 90% of her sessions were now uninterrupted by her family. (Tr. 192). The therapist also stated that although plaintiff was still very guarded in communication, she was still able to manage the day care in her home and take care of her two children. (Tr. 192). On October 4, 2001, the therapist reported that plaintiff and her partner were more stable, and the children were in therapy. (Tr. 207). The therapist's handwritten report appears to state that plaintiff was "exploring job training." (Tr. 207).

Jennifer Wainman-Sauda, M.S., M.A. has treated plaintiff and her family on a

---

[7]Five of the periodic reviews are signed by plaintiff, therapist Childers, and a psychiatrist whose signature is not legible. (Tr. 189, 191, 193, 195, 197). No signatures appear on the other periodic reviews.

once to twice a week basis since July 2000.[8]  (Tr. 132, 141).  On March 6, 2002,

therapist Wainman-Sauda wrote a letter to the agency at plaintiff's request. (Tr. 132).

The letter stated that plaintiff was diagnosed with Post Traumatic Stress Disorder;

Generalized Anxiety; Major Depression; and Borderline Personality Disorder. (Tr.

132).  Therapist Wainman-Sauda stated that plaintiff's mental health was "disabling."

(Tr. 132).

In April 2002, therapist Wainman-Sauda completed a form sent by the New

York State Office of Temporary and Disability Assistance. (Tr. 141-46).  Therapist

Wainman-Sauda rated plaintiff's attention, concentration, and orientation well within

normal limits. (Tr. 144).  She rated plaintiff's memory as excellent, and stated that

plaintiff had good retention of information, good judgment, but poor insight. (Tr.

144).  Plaintiff had difficulty going anywhere alone in public due to anxieties and

fears.  Therapist Wainman-Sauda concluded that plaintiff's PTSD and depressed

mood altered her perception, and she would have great trouble getting alone with

peers and supervisors. (Tr. 144).

In March 2003, therapist Wainman-Sauda completed an "Ability to do Work-

Related Activities (Mental)" medical statement. (Tr. 236-38).  In this form, therapist

Wainman-Sauda stated that plaintiff's reaction and perception of events is skewed,

and plaintiff lacks clarity and judgment. (Tr. 237).  Therapist Wainman-Sauda

believes that plaintiff makes poor decisions, and her daily life is so stressful that she

would not be able to work. (Tr. 237).  However, therapist Wainman-Sauda indicated

---

[8] See *supra* note 4.

that she did not assess for activities such as understanding and remembering detailed instructions, carrying out detailed instructions, or setting realistic goals and making plans independent of others. (Tr. 237).  The therapist stated that in order to assess for those activities, plaintiff should be seen by a psychologist. (Tr. 237).  Finally, the therapist stated that plaintiff could not work and would miss work more than three times a month due to her impairments.  (Tr. 238).

**B.    Consultative Physicians**

On April 19, 2002, plaintiff was examined by Dr. Kalyani Ganesh, a consultative physician and Dr. Kristen Barry, Ph.D., a consultative psychologist. (Tr. 133-35, 136-40).  Dr. Ganesh diagnosed plaintiff with Fibromyalgia and found no limitation to sitting, standing, walking, bending, and climbing; and mild limitations to lifting, carrying, pushing and pulling. (Tr. 135).

Dr. Barry diagnosed plaintiff with depressive disorder, NOS and possible PTSD.  Dr. Barry concluded plaintiff's allegations were consistent with the examination and opined plaintiff was able to understand simple directions and maintain concentration.  (Tr. 139).

**C.    Residual Functional Capacity Evaluations**

A non-examining disability analyst completed a physical residual functional capacity (RFC) assessment and a non-examining psychologist completed a mental RFC assessment in May 2002.  The mental RFC assessment concluded plaintiff was "capable of performing a job with simple tasks with adequate concentration."  (Tr. 165).  In the physical RFC assessment, the disability analyst noted plaintiff's

diagnosis of fibromyalgia, and determined that plaintiff could occasionally lift twenty pounds, frequently lift ten pounds, stand for six hours a day, and sit for six hours a day. (Tr. 166-67).

## DISCUSSION

To be considered disabled, a plaintiff seeking disability insurance benefits or SSI disability benefits must establish that she is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months ...." 42 U.S.C. § 1382c(a)(3)(A). In addition, the plaintiff's

> physical or mental impairment or impairments [must be] of such severity that [she] is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which [she] lives, or whether a specific job vacancy exists for [her], or whether [she] would be hired if [she] applied for work.

42 U.S.C. § 1382c(a)(3)(B).

The Commissioner uses a five-step process, set forth in 20 C.F.R. §§ 404.1520 and 416.920 to evaluate disability insurance and SSI disability claims.

> First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity. If [she] is not, the [Commissioner] next considers whether the claimant has a "severe impairment" which significantly limits [her] physical or mental ability to basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which meets or equals the criteria of an impairment listed in Appendix 1 of the regulations. If the claimant has such an

impairment, the [Commissioner] will consider [her] disabled without considering vocational factors such as age, education, and work experience; ... .  Assuming the claimant does not have listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, [she] has the residual functional capacity to perform [her] past work. Finally, if the claimant is unable to perform [her] past work, the [Commissioner] then determines whether there is other work which the claimant can perform.

*Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982); *see* 20 C.F.R. §§ 404.1520, 416.920.

The plaintiff has the burden of establishing disability at the first four steps. However, if the plaintiff establishes that her impairment prevents her from performing her past work, the burden then shifts to the Commissioner to prove the final step. *Bluvband v. Heckler*, 730 F.2d 886, 891 (2d Cir. 1984).

## 1.    Scope of Review

In reviewing a final decision of the Commissioner, a court must determine whether the correct legal standards were applied and whether substantial evidence supports the decision. *Rosado v. Sullivan*, 805 F. Supp. 147, 153 (S.D.N.Y. 1992) (citing *Johnson v. Bowen*, 817 F.2d 983, 985 (2d Cir. 1987)).  A reviewing court may not affirm an ALJ's decision if it reasonably doubts whether the proper legal standards were applied, even if the decision appears to be supported by substantial evidence. *Johnson*, 817 F.2d at 986.  In addition, an ALJ must set forth the crucial factors justifying his findings with sufficient specificity to allow a court to determine whether substantial evidence supports the decision. *Ferraris v. Heckler*, 728 F.2d 582, 587 (2d Cir. 1984).  A court's factual review of the Commissioner's final

12

decision is limited to the determination of whether there is substantial evidence in the record to support the decision. 42 U.S.C. § 405(g); *Rivera v. Sullivan*, 923 F.2d 964, 967 (2d Cir. 1991). "Substantial evidence has been defined as 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Williams on behalf of Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988)(citations omitted). It must be "more than a scintilla" of evidence scattered throughout the administrative record. *Richardson v. Perales*, 402 U.S. 389, 401 (1971)(quoting *Consolidated Edison Co. v. NLRB*, 197 U.S. 229 (1938)).

"To determine on appeal whether an ALJ's findings are supported by substantial evidence, a reviewing court considers the whole record, examining the evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight." *Williams*, 859 F.2d at 258. However, a reviewing court cannot substitute its interpretation of the administrative record for that of the Commissioner if the record contains substantial support for the ALJ's decision. *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972). *See also Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982), *cert. denied*, 459 U.S. 1212 (1983).

## 2.    Residual Functional Capacity (RFC) and Treating Physician

In rendering an RFC determination, the ALJ must consider objective medical facts, diagnoses and medical opinions based on such facts, as well as a plaintiff's subjective symptoms, including pain and descriptions of other limitations. 20 C.F.R §§ 404.1545; 416.945. *See Martona v. Apfel*, 70 F. Supp. 2d 145 (N.D.N.Y.

1999)(citing *LaPorta v. Bowen*, 737 F. Supp. 180, 183 (N.D.N.Y. 1990)).  RFC can only be established when there is substantial evidence of each physical requirement listed in the regulations. *LaPorta v. Bowen*, 737 F. Supp. at 183.   Furthermore, an ALJ must specify the functions plaintiff is capable of performing, and may not simply make conclusory statements regarding a plaintiff's capacities.  *Verginio v. Apfel*, 1998 WL 743706 (N.D.N.Y. Oct. 23, 1998); *LaPorta v. Bowen*, 737 F. Supp. at 183.

In this case, plaintiff argues that the ALJ did not properly assess her RFC. Counsel for plaintiff cites Social Security Ruling 96-8p and argues that the ALJ did not analyze all the factors necessary for a proper finding of plaintiff's residual functional capacity.  The ALJ found that plaintiff has severe mental and physical impairments. (Tr. 16).  The impairments are therefore, both exertional (physical) and non-exertional (mental).  The ALJ concluded that this plaintiff could perform the physical requirements for work except for lifting and carrying in excess of ten pounds frequently and 20 pounds occasionally. (Tr. 16).  Plaintiff was also limited in her ability to push and pull. (Tr. 16).  Plaintiff's mental impairments created a moderate limitation in the ability to understand, remember, and carry out complex job instructions. (Tr. 16).

Plaintiff argues that in making this assessment of plaintiff's RFC, the ALJ ignored or did not properly consider the opinions of plaintiff's treating sources, particularly plaintiff's treating mental health providers.  While a treating physician's opinion is not binding on the Commissioner, the opinion must be given controlling weight when it is well supported by medical findings and ***not inconsistent with other***

14

*substantial evidence*. *See Veino v. Barnhart*, 312 F.3d 578, 588 (2d Cir. 2002); 20 C.F.R. § 416.927(d).  If the treating physician's opinion is contradicted by other substantial evidence, the ALJ is not required to give the opinion controlling weight. *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004).  The ALJ must, however, properly analyze the reasons that the report is rejected. *Id.*  An ALJ may not arbitrarily substitute his own judgment for competent medical opinion. *Rosa v. Callahan*, 168 F.3d 72, 79 (2d Cir. 1999).

If the treating physician's opinion is not given controlling weight, the ALJ must assess the following factors: the length of the treatment relationship; the frequency of examination for the condition in question; the medical evidence supporting the opinion; the consistency of the opinion with the record as a whole; the qualifications of the treating physician; and other factors tending to support or contradict the opinion. 20 C.F.R. §§ 404.1527(d)(2)-(d)(6); 416.927(d)(2)-(d)(6). Failure to follow the proper standard is a ground for reversal. *Barnett v. Apfel*, 13 F. Supp. 2d 312, 316 (N.D.N.Y. 1998)(citation omitted).

In this case, the ALJ's assessment of plaintiff's ***physical*** abilities is ***completely consistent*** with the opinions of both plaintiff's treating physicians and the opinion of Dr. Kalyani Ganesh, the consultative physician.  Plaintiff herself testified that she could lift "[m]aybe 15, 20 pounds." (Tr. 267).  Dr. Finkenstadt stated on many occasions that plaintiff's back was ***not*** the reason for her lack of employment, and also stated that plaintiff was not working by "choice." (Tr. 82, 87, 93, 95).  The only physical limitation stated by Dr. Finkenstadt was that plaintiff should "[a]void heavy

lifting." In February of 2003, Dr. Sobhy stated that plaintiff was doing "quite well" and that her pain had been under control for "years." (T. 211). In fact, it appears from the record that plaintiff was not examined by Dr. Sobhy between April of 2002 and February of 2003, when he made the statement that plaintiff was doing quite well. Plaintiff had full strength in all muscle groups in February of 2002. (Tr. 211). Although Dr. Sobhy concluded that pain "limited" plaintiff, he did not state the extent of those limitations and, in fact, stated that a functional capacity evaluation should be completed. (Tr. 231-33).

Dr. Sobhy also stated that plaintiff should engage in exercise and physical therapy. (Tr. 119, 131). In fact, in Dr. Sobhy's February 2003 report, he stated that upon the request of plaintiff's therapist, he was going to try to treat plaintiff without medication. (Tr. 211). In April of 2002, Dr. Ganesh, the consultative physician, found that plaintiff had "no limitation" in sitting, standing, walking, bending, and climbing. (Tr. 135). Plaintiff did have mild limitations in lifting, carrying, pushing, and pulling. (Tr. 135). This is ***consistent*** with Dr. Sobhy's assessment in 2003 that plaintiff was doing quite well, and that her pain was under control.

Thus, the ALJ's determination of plaintiff's ***physical*** RFC is completely consistent with plaintiff's treating physicians and with Dr. Ganesh, the consulting physician, and the ALJ did not err in analyzing "inconsistencies" that did not exist. Plaintiff's counsel is concerned because the ALJ considered an RFC form completed by a "disability analyst" in determining plaintiff's RFC. (Tr. 166-73). The ALJ mistakenly referred to the "disability analyst" as a "State Agency medical

consultant."[9] (Tr. 15).  The disability analyst basically found that plaintiff could physically perform light work.

While it is true that the ALJ erred in calling the disability analyst a medical consultant, this court finds that any error in this regard was harmless.  This report is completely consistent with plaintiff's own assessment of her ability to lift and with her treating physicians' medical reports, stating that she should avoid "heavy lifting," and finding that her pain was controlled.  The analyst's assessment was also *completely consistent* with Dr. Ganesh's analysis of plaintiff's abilities.  Any error in the ALJ's labeling of the analyst's physical RFC evaluation is ***harmless***. *See Brown v. Barnhart*, 04 Civ. 2450, 2005 U.S. Dist. LEXIS 7466, *30-31 & n.8 (S.D.N.Y. April 27, 2005)(ALJ's error is harmless if the result would have been the same and the ALJ's conclusion is supported by substantial evidence).

Plaintiff also argues that the ALJ erred in failing to properly consider or give appropriate weight to the opinions of plaintiff's mental health professionals.  The court would first point out that neither of plaintiff's "mental health professionals" are "acceptable medical sources" under the regulations.  The court notes that plaintiff's counsel properly argued that the "disability analyst" was not an "acceptable medical source," without noting that neither therapist Childers nor therapist Wainman-Sauda have credentials that place them in the category of acceptable medical sources.

---

[9] The error could have been made because the court notes that one of the two non-examining sources is an acceptable medical source. *See* (Tr. 165).  The mental RFC was written by Kusum Walia, Ph.D. (Tr. 165).  Thus, one of the non-examining reports was submitted by a "medical consultant."

Therapist Dan Childers is Certified Social Worker.[10] (Tr. 189).  Therapist Jennifer

Wainman-Sauda's letterhead states that she is a therapist and a "child

psychotherapist," however, she is clearly not a licensed or certified psychologist. (Tr.

132).  The regulations specifically provide that acceptable medical sources are

"Licensed or certified psychologists." 20 C.F.R. § 416.913(a)(2).  Social workers

come under the heading of "[o]ther sources" that the agency "may" consider in

determining the effect of a claimant's impairment on her ability to work. *Id.* §

416.913(d)(2) & (d)(3).

   In this case, both the consultative psychologist and the non-examining

psychologist are acceptable medical sources, and the ALJ did not err in giving these

sources more weight than plaintiff's mental health professionals.  Because neither of

plaintiff's treating medical professionals were "treating sources," the ALJ did not

have to engage in the detailed analysis required when a treating physician or "treating

source" opinion is rejected.  Plaintiff argues that the ALJ did not properly consider

the opinion of both therapist Wainman-Sauda and Dr. Barry that plaintiff would have

difficulty dealing with "stressors," a limitation that can significantly affect RFC.

   Dr. Barry stated that plaintiff "appears to have some difficulty handling the

stressors." (Tr. 139).  The ALJ did not specifically mention "stressors" in his opinion.

However, "although required to develop the record fully and fairly, an ALJ is not

---

   [10] The court notes that initially, the reports from the Onondaga Pastoral Counseling Center
were signed by therapist Paul Hughes, who is also a Certified Social Worker. (T. 184, 185).
Although there appears to be the signature of a psychiatrist below the therapists' signatures, it is
clear that plaintiff was treated only by the social workers and has never mentioned a psychiatrist.

required to discuss all the evidence submitted, and [his] failure to cite specific evidence does not indicate that it was not considered." *Barringer v. Comm'r, Soc. Sec. Admin.* 358 F. Supp. 2d 67, 79 (N.D.N.Y. 2005) (quoting *Craig v. Apfel*, 212 F.3d 433, 436 (8th Cir. 2000) (citation omitted)).  Where "the evidence of record permits [the court] to glean the rationale of an ALJ's decision, [the ALJ is not required to explain] why he considered particular evidence unpersuasive or insufficient to lead him to a conclusion of disability."  *Mongeur v. Heckler*, 722 F.2d 1033, 1040 (2d Cir. 1983).

In this case, the ALJ found that plaintiff's mental impairment did significantly limit plaintiff's ability to perform the full range of the exertional category of work that she was able to perform.  This is what led to the ALJ obtaining the testimony of a vocational expert.  Thus, the fact that the ALJ did not mention the effect of stressors in his discussion of RFC does not require remand.

## 3.    **Credibility**

"An [ALJ] may properly reject [subjective complaints] after weighing the objective medical evidence in the record, the claimant's demeanor, and other indicia of credibility, but must set forth his or her reasons 'with sufficient specificity to enable us to decide whether the determination is supported by substantial evidence.'" *Lewis v. Apfel*, 62 F. Supp. 2d 648, 651 (N.D.N.Y. 1999)(quoting *Gallardo v. Apfel*, No. 96 CIV 9435, 1999 WL 185253, at *5 (S.D.N.Y. March 25, 1999)).  To satisfy the substantial evidence rule, the ALJ's credibility assessment must be based on a two step analysis of pertinent evidence in the record.  *See* 20 C.F.R. §§ 404.1529,

416.929; *see also Foster v. Callahan*, No. 96-CV-1858, 1998 WL 106231, at *5 (N.D.N.Y. March 3, 1998).

First, the ALJ must determine, based upon the claimant's objective medical evidence, whether the medical impairments "could reasonably be expected to produce the pain or other symptoms alleged...." 20 C.F.R. §§ 404.1529(a), 416.929(a). Second, if the medical evidence alone establishes the existence of such impairments, then the ALJ need only evaluate the intensity, persistence, and limiting effects of a claimant's symptoms to determine the extent to which it limits the claimant's capacity to work. *Id.* §§ 404.1529(c), 416.929(c).

When the objective evidence alone does not substantiate the intensity, persistence, or limiting effects of the claimant's symptoms, the ALJ must assess the credibility of the claimant's subjective complaints by considering the record in light of the following symptom-related factors: (1) claimant's daily activities; (2) location, duration, frequency, and intensity of claimant's symptoms; (3) precipitating and aggravating factors; (4) type, dosage, effectiveness, and side effects of any medication taken to relieve symptoms; (5) other treatment received to relieve symptoms; (6) any measures taken by the claimant to relieve symptoms; and (7) any other factors concerning claimant's functional limitations and restrictions due to symptoms. *Id.* §§ 404.1529(c)(3), 416.929(c)(3).

In this case, the ALJ found that plaintiff was only "partially credible." (Tr. 15). Although the ALJ's "discussion" is not completely clear, the ALJ did state that the plaintiff testified that she cleaned, did laundry, took care of her personal needs,

20

including doing her own hair, does some household chores, and is able to drive. (Tr. 15). Then, the ALJ notes that plaintiff testified that she could only stand for 45 minutes, sit for 30 minutes, walk for 10 minutes, and lift 20 pounds. (Tr. 15). Based upon her own testimony regarding her daily activities, the ALJ apparently found that the severity of her physical limitations was overstated, and only "partially credible."

The records supports the ALJ's rejection of plaintiff's credibility even though the ALJ did not completely analyze plaintiff's pain according to the regulations. As stated above, any error that the ALJ made in this regard is harmless, particularly in view of Dr. Sobhy's comments regarding plaintiff's pain in 2003.

**4.** **Vocational Expert**

Generally if a plaintiff's non-exertional impairments "significantly limit the range of work" permitted by the plaintiff's exertional limitations, then the ALJ may not use the Medical-Vocational Guidelines exclusively to determine whether plaintiff is disabled. *Bapp v. Bowen*, 802 F.2d 601, 606 (2d Cir. 1986). If the plaintiff's range of work is significantly limited by her non-exertional impairments, then the ALJ must present the testimony of a VE or other similar evidence regarding the availability of other work in the national economy that plaintiff can perform. *Id.* A VE may provide testimony regarding the existence of jobs in the national economy and whether a particular claimant may be able to perform any of those jobs given his or her functional limitations. *See Rautio v. Bowen*, 862 F.2d 176, 180 (8th Cir. 1988); *Dumas v. Schweiker*, 712 F.2d 1545, 1553-54 (2d Cir. 1983).

21

Although the ALJ is initially responsible for determining the claimant's capabilities based on all the evidence,[11] a hypothetical question that does not present the full extent of a claimant's impairments cannot provide a sound basis for the VE's testimony. *See De Leon v. Secretary of Health and Human Services.*, 734 F.2d 930, 936 (2d Cir. 1984); *Lugo v. Chater*, 932 F. Supp. 497, 503-04 (S.D.N.Y. 1996).  The Second Circuit has stated that there must be "substantial record evidence to support the assumption upon which the vocational expert based her opinion." Dumas, 712 F.2d at 1554.

In this case, the ALJ found that plaintiff's mental impairment significantly reduced the number of jobs that plaintiff could perform, thus, the ALJ obtained the testimony of a vocational expert. (Tr. 288-94).  The vocational expert found that with plaintiff's limitations, she could still perform substantial gainful activity in the national economy. (Tr. 290-91).  When the plaintiff's attorney asked whether plaintiff could still perform work in the national economy if she had a "moderate" limitation in both getting along with supervisors and co-workers, attention, and concentration, the VE stated that plaintiff could still perform the jobs to which he had testified earlier. (Tr. 294).  The VE stated that he believed that even those moderate limitations would ***not*** prevent plaintiff from performing "simple tasks, operating type positions." (Tr. 294).

Because this court finds that the ALJ's determination of plaintiff's RFC is

---

[11] *Dumas*, 712 F.2d at 1554 n.4.

supported by substantial evidence, the court also finds that the ALJ's hypothetical question was proper.  This court does not find that the ALJ's failure to mention that plaintiff might have trouble with "stressors," requires a remand, given that the statement in Dr. Barry's report that she appeared to have "some" difficulty with stressors did not indicate what further limitation this would place on plaintiff's ability to work, and the jobs stated by the VE were specifically limited to "simple" tasks.

**WHEREFORE,** based on the findings above, it is hereby

**RECOMMENDED,** that the complaint be **DISMISSED.**

Pursuant to 28 U.S.C. § 636(b)(1), the parties have ten days within which to file written objections to the foregoing report.  Such objections shall be filed with the Clerk of the Court.  **FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW.**  *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72, 6(a), 6(e).

Dated: December 14, 2006


Hon. Gustave J. DiBianco
U.S. Magistrate Judge