**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**DARLENE M. ALLEN,**

                             **Plaintiff,**                    **6:05-CV-0101**
          **vs.**                                             **(NAM/GJD)**

**MICHAEL J. ASTRUE\*\***
**COMMISSIONER OF SOCIAL SECURITY,**

                         **Defendant.**
_____

**APPEARANCES:**                                   **OF COUNSEL:**

Olinsky & Shurtliff, LLP                    Howard D. Olinsky, Esq.
300 South State Street
Fifth Floor
Syracuse, New York 13202
*Attorney for Plaintiff*

Glenn T. Suddaby                            Ellen E. Sovern
United States Attorney for the              Assistant United States Attorney
Northern District of New York
P.O. Box 7198
100 South Clinton Street
Syracuse, New York 13261-7198
and
Office of General Counsel                   Barbara L. Spivak
Social Security Administration              Chief Counsel, Region II
16 Federal Plaza
New York, New York 10278
*Attorneys for Defendant*

  \*\* On February 12, 2007, Michael J. Astrue was sworn in as Commissioner of the Social Security
Administration.  Pursuant to Federal Rule of Civil Procedure 25(d)(1), he is automatically substituted
for former Commissioner Joanne B. Barnhart as the defendant in this action.

**Norman A. Mordue, Chief Judge:**

**MEMORANDUM-DECISION AND ORDER**

        This action, brought by plaintiff Darlene M. Allen, an unsuccessful claimant for disability

benefits, requires the Court to determine whether defendant, Commissioner of Social Security

(the "Commissioner"), properly concluded that plaintiff, although severely impaired, was not entitled to such benefits because of her remaining ability to perform light work.  The Commissioner argues that there is substantial evidence in support of a conclusion that the plaintiff is not disabled, and claims that this determination was based upon the appropriate legal standards. Plaintiff and the Commissioner have filed opposing motions for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c).

The Court referred this matter to United States Magistrate Judge Gustave J. DiBianco pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule 72.3(d).  Magistrate Judge DiBianco reported that the Commissioner's decision was supported by substantial evidence, and recommended that the Court uphold the denial of benefits.  Plaintiff now objects to Magistrate Judge DiBianco's Report and Recommendation, arguing that the Commissioner's determination of non-disability was improper because it was based upon an inaccurate application of the relevant legal standards and because it was not supported by substantial evidence in the record.

The Court, having considered the Report and Recommendation, the objections thereto, and the entire administrative record, finds that the Commissioner failed to properly evaluate or explain the weight given to the medical opinions of plaintiff's treating sources.  Furthermore, the Commissioner did not perform the required analysis when determining the plaintiff's credibility, nor did he support his conclusion of "partial credibility" with substantial evidence.  The Court therefore remands this case to the Commissioner for further development of the record and a determination on disability pursuant to the proper legal standards.

## I.   Background

Plaintiff was born on April 16, 1963, and was 39 years old at the time of the administrative hearing in March of 2003.  (T. 261).  Plaintiff, a high school graduate, testified that

she lived in a mobile home with her husband and school-age son and daughter.  (T. 261-263).

Plaintiff's prior work history was limited to a brief period when she operated a licensed childcare

service from her home.[1]  Plaintiff claims that she stopped all work activity in October of 1999 due

to constant pain, fatigue, and an inability to lift the children in her care.  (T. 47).

Plaintiff's medical records indicate that she began to experience chronic pain in her low

back after falling off a bicycle in 1988.  (T. 105, 110, 129).  Plaintiff states that she was diagnosed

with fibromyalgia and myofascial pain syndrome in 1989.  (T. 68, 133).  Despite these diagnoses,

plaintiff told consultative examiner Kalyani Ganesh, M.D., that her symptoms were "not that bad"

until after the birth of her second child in 1996.  (T. 133).  Plaintiff's medical chart states that she

was diagnosed with chronic lumbosacral dysfunction in October of 1998.  (T. 96).

John Finkenstadt, M.D., treated plaintiff for low back pain on a monthly basis between

March and December of 2000.  (T. 82, 83, 87, 90, 92, 93, 95).  According to his treatment notes,

Dr. Finkenstadt diagnosed plaintiff with chronic lumbosacral dysfunction, chronic low back pain,

and depression.  (*Id.*).  He treated plaintiff with monthly prolotherapy injections, which plaintiff

tolerated well, and prescriptions for Flexeril, Paxil, and Zoloft.  (*Id.*).  Plaintiff reported that she

was under the care of a chiropractor, and Dr. Finkenstadt encouraged her to continue chiropractic

treatment.  (T. 92, 93).

In his treatment notes from March 17, 2000 and October 10, 2000, Dr. Finkenstadt

recognized that plaintiff had a "mild to moderate partial disability."  (T. 95, 83).  However, during

the course of his treatment relationship with plaintiff, Dr. Finkenstadt noted on several occasions

that she was unemployed "per her choice," not because of low back pain.  (T. 82, 87, 93, 95).

---

[1]  Plaintiff provided conflicting information regarding the period of time she spent working as a childcare provider.  Plaintiff completed a Disability Report on March 18, 2002 in which she stated that she worked in this capacity from November 1997 until October 1999.  (T. 48).  Plaintiff later testified, however, that her employment as a childcare provider was limited to a duration of one year.  (T. 273-274).

The most recent treatment note from Dr. Finkenstadt, dated December 13, 2000, stated that plaintiff was no longer taking pain medications, and discharged plaintiff in "good condition" with directions to follow up in three months.  (T. 82).

On March 7, 2001, plaintiff began treatment with family medicine practitioner Lauri Fairbanks-Doane, D.O.  (T. 108-109).  Although plaintiff had "no specific concerns or complaints," she requested "a referral to a pain clinic or pain specialist" for chronic pain in her low back and right leg.  (T. 108).  Dr. Fairbanks-Doane's notes indicate that plaintiff was given a referral to "Dr. Mastin for chronic pain treatment," but there is no further evidence that plaintiff was treated by Dr. Mastin.  (*Id*.).

Dr. Fairbanks-Doane took a detailed history and performed a complete physical examination of plaintiff on April 4, 2001.  (T. 105-107).  Plaintiff again reported chronic low back pain, which caused her to experience difficulty sleeping.  (T. 105).  Dr. Fairbanks-Doane diagnosed plaintiff with depression and chronic low back pain with right sciatica.  (T. 106).  She advised plaintiff to "[c]ontinue counseling every other week," and "[c]ontinue with Dr. Sobhy for pain control and possible steroid injections."  (T. 107).  Dr. Fairbanks-Doane also prescribed Celexa and Ultram, and referred plaintiff "to Dr. Distefano for consultation regarding back pain and sciatica."  (*Id*.).

Pain specialist Saad Sobhy, M.D., first treated plaintiff on April 9, 2001.  Plaintiff told Dr. Sobhy that her problems started in 1988 after she fell.  (T. 129).  Over time, plaintiff began to experience "right sided mid and low back pain that gradually progressed to involve the right lower limb, [and] became associated with neck stiffness and numbness involving both hands." (*Id*.).  Plaintiff's pain worsened in 1996 and, as of April 9, 2001, plaintiff reported that her symptoms were constant, "exacerbated by sitting, standing, walking, and lifting and nothing

improves them." (*Id.*).  Dr. Sobhy diagnosed plaintiff with myofascial pain syndrome and

mechanical low back pain syndrome.  (T. 131).  Electrophysiological studies performed by Dr.

Sobhy showed no evidence of neuropathy, radiculopathy, plexopathy, or myopathy.  (T. 121,

123).

On February 6, 2002, Dr. Sobhy noted that plaintiff "showed reduction in the range of

motion of the cervical spine with tenderness at end of ranges."  (T. 119).  However, Dr. Sobhy's

notes also stated that plaintiff's lumbar spine range of motion "showed significant improvement

following the epidural injections which helped her significantly."  (*Id.*).  He prescribed Celexa,

Amitriptyline, and Depakote for treatment of plaintiff's pain, but indicated that she could not

tolerate the anti-convulsant medications Lamotrignine or Zonegran because of GI upset.  (*Id.*).

Dr. Sobhy completed a "Physical Medical Source Statement," which the Administration

received on April 4, 2002.  (T. 174).  According to his statement, Dr. Sobhy diagnosed plaintiff

with myofascial pain syndrome and mechanical low back pain syndrome, and he reported that

plaintiff's symptoms included neck and low back pain, tiredness, and fatigue.  (T. 230).  He

evaluated plaintiff's prognosis as "poor," and indicated that treatment with oral medications

caused plaintiff to experience tiredness, fatigue, and sexual dysfunction.  (*Id.*).  Dr. Sobhy also

affirmed that plaintiff's experience of pain and other symptoms was frequently severe enough to

interfere with her attention and concentration.  (T. 231).

Kalyani Ganesh, M.D., performed a consultative orthopedic examination of plaintiff on

April 19, 2002.  (T. 133-135).  Plaintiff reported lower back pain extending from her right ribs

and hip down her right leg, which increased with being in one position for too long.  (T. 133).

Plaintiff also stated that she suffered from constant fatigue, depression, and sadness.  (*Id.*).

Plaintiff informed Dr. Ganesh that she was currently receiving nerve blocks at a pain management

clinic, which helped to alleviate her symptoms.  (T. 133).  According to plaintiff, prolotherapy

was not successful in relieving her pain, but medications helped some.  (*Id*.).

Based on her examination of plaintiff, Dr. Ganesh diagnosed plaintiff with fibromyalgia.

(T. 135).  Dr. Ganesh indicated that plaintiff's prognosis was stable, and that there were "[n]o

physical limitations to sitting, standing, walking, bending, and climbing."  (*Id*.).  However, Dr.

Ganesh believed that plaintiff had "minimal to mild limitations to lifting, carrying, pushing, and

pulling."  (*Id*.).

Plaintiff was evaluated at the Onondaga Pastoral Counseling Center in August of 1997

after she was referred for treatment by her daughter's school counselor.  (T. 179).  The initial

assessment indicated that plaintiff suffered from symptoms of low self-esteem, low energy, poor

appetite, poor concentration, and feelings of hopelessness.  (*Id*.).  The evaluating physician

diagnosed plaintiff with dysthymic disorder and noted that her Global Assessment of Functioning

("GAF") level was 53.  (T. 182).  Pursuant to this evaluation, plaintiff began weekly

psychotherapy sessions with a clinical social worker.  (T. 183)

In 2000, plaintiff began treatment with Jennifer L. Wainman-Sauda, a marriage and family

therapist.  (T. 132).  Ms. Wainman-Sauda diagnosed plaintiff with post-traumatic stress disorder,

generalized anxiety disorder, major depression, and borderline personality disorder.  (*Id*.).  She

began treating plaintiff with weekly psychotherapy sessions, and, with the approval of Dr. Sobhy,

advised that plaintiff discontinue all psychotropic medications.  (T. 211).  The administrative

record contains three statements from Ms. Wainman-Sauda which indicate the debilitating nature

of plaintiff's psychological impairments along with the therapist's opinion regarding plaintiff's

inability to work.  (T. 132, 141-146, 236-238).

Kristen Barry, Ph.D., performed a psychological examination of plaintiff on April 19,

2002.  (T. 136-140).  Dr. Barry concluded that plaintiff was able to follow and understand simple directions and instructions, and was able to maintain attention and concentration.  (T. 139). However, Dr. Barry believed that plaintiff would have difficulty handling stressors, and that plaintiff's high level of pain impaired her ability to function.  (*Id*.).  The psychologist diagnosed plaintiff with depressive disorder, but did not rule out the possibility of post-traumatic stress disorder.  (Id.).

## II.    Procedural History

On February 28, 2002, at age 38, plaintiff filed an application for Supplemental Security Income ("SSI") pursuant to Title XVI of the Social Security Act.  (T. 41).  *See* 42 U.S.C. § 1381 et seq. (Title XVI).  Plaintiff alleged disability since December 1, 1998 due to chronic pain resulting from fibromyalgia and myofascial pain syndrome.  (T. 47).  Plaintiff also reported that she was suffering from post traumatic stress disorder, depression, and fatigue.  (*Id*.)

The Social Security Administration (the "Administration") initially denied plaintiff's application for SSI benefits in a letter dated May 21, 2002.  (T. 23-25).  On July 18, 2002, plaintiff submitted a request for an administrative hearing, which was held before Administrative Law Judge ("ALJ") James A. Paisley on March 17, 2003.  (T. 26, 255-296).  At the hearing, the ALJ heard testimony from plaintiff and from vocational expert David A. Festa.

The ALJ issued an unfavorable decision on May 20, 2003.  (T. 14-18).  He found that plaintiff suffered from severe impairments which prevented her from performing her past relevant work as a childcare provider.  (T. 17).  Nevertheless, the ALJ concluded that plaintiff did not qualify as "disabled" under the Act because of her remaining ability to perform slightly less than the full range of light work.  (*Id*.).  The ALJ consequently denied plaintiff's petition for SSI. (*Id*.).

On January 7, 2005, the Appeals Council issued a statement denying plaintiff's request for a review of the ALJ's determination of non-disability.  (T. 4-6).  The ALJ's decision therefore became the final decision of the Commissioner.  20 C.F.R. § 416.1481.  Plaintiff filed this action on January 27, 2005, seeking judicial review of the Commissioner's denial of disability benefits.

## III.    Decision of the Administrative Law Judge

The Social Security Act (the "Act") authorizes payment of Supplemental Security Income to individuals with "disabilities."  *See* 42 U.S.C. § 1381 et seq. (Title XVI).  The Act defines a "disability" as an inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."  42 U.S.C. § 1382c(a)(3)(A) (1994 ed., Supp. V) (Title XVI).  A person qualifies as disabled, and is eligible for such benefits, "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . ."  42 U.S.C. § 1382c(a)(3)(B).  Plaintiff carries "the burden of proving that she suffers from a disability and that her impairment prevents her from returning to her prior employment."  *Betances v. Comm'r of Soc. Sec.*, 206 Fed. Appx. 25, 26 (2d. Cir. 2006); *see also Balsamo v. Chater*, 142 F.3d 75, 80 (2d Cir. 1998).

The regulations set forth a five-step sequential evaluation process, which the administrative law judge must follow when considering a claim for SSI benefits.  20 C.F.R. § 416.920(a)(4); *see also Perez v. Chater*, 77 F.3d 41, 46 (2d Cir. 1996).  The determination of a claimant's request for benefits should therefore proceed as follows:

At the first step, the agency will find non-disability unless the claimant shows that he

is not working at a "substantial gainful activity." At step two, the SSA will find non-disability unless the claimant shows that he has a "severe impairment," defined as "any impairment or combination of impairments which significantly limits [the claimant's] physical or mental ability to do basic work activities." At step three, the agency determines whether the impairment which enabled the claimant to survive step two is on the list of impairments presumed severe enough to render one disabled; if so, the claimant qualifies. If the claimant's impairment is not on the list, the inquiry proceeds to step four, at which the SSA assesses whether the claimant can do his previous work; unless he shows that he cannot, he is determined not to be disabled. If the claimant survives the fourth stage, the fifth, and final, step requires the SSA to consider so-called "vocational factors" (the claimant's age, education, and past work experience), and to determine whether the claimant is capable of performing other jobs existing in significant numbers in the national economy.

*Barnhart v. Thomas*, 540 U.S. 20, 24-25 (2003) (citations omitted).

In the present case, the ALJ followed the five-step sequential evaluation process pursuant to 20 C.F.R. § 416.920. At step one, the ALJ found that plaintiff had not engaged in substantial gainful activity since her alleged onset date of December 1, 1998. (T. 16). At step two, the ALJ concluded that plaintiff suffered from severe mental and physical impairments "including myofascial pain and mechanical low back pain versus fibromyalgia, with normal EMG findings, and Depressive Disorder, N.O.S., Rule out Post-Traumatic Stress Disorder . . . ." (T. 16). At the third step of the analysis, the ALJ determined that none of plaintiff's mental and physical impairments, either alone or in combination, met or medically equaled any of the impairments listed in Appendix 1 of the Regulations. (*Id*.). *See* 20 C.F.R. Pt. 404, Subpt. P, Appendix 1. As a result, the ALJ proceeded to step four of the analysis where he found that plaintiff had the residual functional capacity for light work, with several additional limitations.[2] (*Id*.). The ALJ further determined, based on the testimony of the vocational expert, that plaintiff was unable to

---

[2] The ALJ found that plaintiff could otherwise perform the requirements of light work, but was (1) limited in her ability to lift or carry more than 10 pounds frequently and 20 pounds occasionally; (2) mildly limited in her ability to push or pull; and (3) moderately limited in her ability to understand, remember, and carry out complex job instructions. (T. 16).

perform her past relevant work as a self-employed childcare provider.  (T. 15-17).

At the fifth step, plaintiff has shown her disability, and the burden shifts to the Commissioner to show that there are a significant number of jobs in the national economy that plaintiff can perform based on her residual functional capacity, age, education, and prior vocational experience.  *See* 20 C.F.R. § 404.1560.  In the present case, the ALJ found that plaintiff had a high school education, qualified as a younger individual, and had "acquired work skills, such as helping children, organizing games, [and] teaching simple songs," which were transferable from her previous employment as a childcare provider.  (T. 17).  The ALJ also accepted the opinion of the vocational expert, who testified that "a hypothetical individual of the claimant's age, education, and vocational profile, limited to lifting/carrying a maximum of 10 pounds frequently and 20 pounds occasionally, with mild limitation in the ability to lift, carry, push, and pull, [and] capable of simple, repetitive tasks," could perform jobs that exist in the national economy, such as cafeteria attendant or racker.  (T. 15-16).  The ALJ consequently concluded that plaintiff was not disabled within the meaning of the Act, and denied her request for SSI benefits.  (T. 17).

**IV.      Report and Recommendation of the Magistrate Judge**

The Court referred this case to United States Magistrate Judge Gustave J. Di Bianco for a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule 72.3(d). Magistrate Judge DiBianco, after careful consideration of the entire administrative record and the briefs of both parties, reported that (1) the ALJ properly determined plaintiff's residual functional capacity through application of the required legal analysis; (2) the ALJ gave appropriate weight to the opinions of plaintiff's treating sources in compliance with the treating physician rule; (3) the ALJ's assessment of plaintiff's credibility was not legally erroneous and was supported by

substantial evidence; and (4) because the hypothetical questions posed to the vocational expert accurately represented plaintiff's capabilities, the ALJ did not err in relying on the expert's testimony.  In light of these findings, Magistrate Judge DiBianco recommended that the Court uphold the Commissioner's determination of non-disability and dismiss plaintiff's complaint in its entirety.

Presently before the Court are plaintiff's objections to the Report and Recommendation. When a party timely objects to a magistrate judge's recommendation, this Court will conduct a *de novo* review of the objected-to portions.  28 U.S.C. § 636(b)(1).  The Court may also engage in a *de novo* review of any other aspects of a recommendation as it sees fit.  *Thomas v. Arn*, 474 U.S. 140, 154 (1985).  After performing its review, the Court "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge."  28 U.S.C. § 636(b).

## V.    Discussion

The Commissioner's determination that a claimant is not disabled will be set aside when the factual findings are not supported by "substantial evidence."  42 U.S.C. § 405(g); *see also Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir. 2000).  Substantial evidence has been interpreted to mean "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Shaw*, 221 F.3d at 131.  The Court may also set aside the Commissioner's decision when it is based upon erroneous legal standards.  *Rosa v. Callahan*, 168 F.3d 72, 77 (2d Cir. 1999).

Plaintiff objects to Magistrate Judge DiBianco's Report Recommendation on four grounds, and requests that the Court grant plaintiff's motion for judgment on the pleadings, vacate the Commissioner's determination of non-disability, and remand this action to the Commissioner, with a directed finding of disability, solely for a calculation of benefits.  (Dkt. 10, p. 11).  In her

objections, plaintiff argues that: (1) the ALJ did not appropriately weigh the opinion of plaintiff's treating therapist; (2) the ALJ erred by not complying with the mandates of Social Security Ruling 00-4p; (3) the ALJ erroneously relied upon the testimony of the vocational expert because the hypothetical questions to the vocational expert did not conform to his ultimate determination of plaintiff's residual functional capacity; and (4) the ALJ did not apply the appropriate legal standard in assessing plaintiff's credibility.

### A.     Therapist - Treating Source

Plaintiff objects to the Magistrate Judge's conclusion that the ALJ properly weighed the opinion of plaintiff's treating therapist, Jennifer L. Wainman-Sauda.  Plaintiff argues that the ALJ failed to evaluate and provide a rationale for the weight accorded to Wainman-Sauda's opinion regarding plaintiff's mental ability to perform work related activities.

Wainman-Sauda, a licensed marriage and family therapist, began treating plaintiff in 2000.[3]  In a letter dated March 6, 2002, Wainman-Sauda stated that plaintiff had been diagnosed with post-traumatic stress disorder, generalized anxiety disorder, major depression, and borderline personality disorder.  (T. 132).  Wainman-Sauda also declared that, "without hesitation," she viewed plaintiff's "mental health as disabling."  (*Id*.).

On April 27, 2002, Wainman-Sauda completed a questionnaire sent by the New York State Office of Temporary and Disability Assistance in which she diagnosed plaintiff with post-traumatic stress disorder, depression, and borderline personality disorder.  (T. 141-142).

---

[3]  As Magistrate Judge DiBianco noted in his Report and Recommendation, the record contains conflicting accounts of when plaintiff began treatment with Wainman-Sauda.  According to the March 6, 2002 letter written by Wainman-Sauda, she originally treated plaintiff in July of 2000.  (T. 132).  Ms. Wainman-Sauda, however, also submitted a disability questionnaire, dated April 27, 2002, in which she reported first treating plaintiff in November of 2000.  (T. 141).

Wainman-Sauda reported that plaintiff's global assessment of functioning ("GAF") score was 41[4], and her symptoms included a depressed mood, nightmares, and poor management of anger.  (T. 141).  Although plaintiff's attention, concentration, memory, and orientation were all within normal limits, her insight was poor.  (T. 144).  Wainman-Sauda asserted that plaintiff had "difficulty going anywhere alone in public due to anxieties and fears."  (T. 144).  Moreover, plaintiff's "PTSD and depressed mood alter her perception [such] that I think she would have great trouble getting along [with] peers and supervisors."  (*Id*.).

Wainman-Sauda completed an assessment of plaintiff's "Ability to do Work-Related Activities (Mental)" in March of 2003.  (T. 236-238).  Her assessment indicated that plaintiff would have no useful ability to maintain regular attendance and be punctual within customary tolerances, complete a normal workday and workweek without interruption from psychologically based symptoms, perform at a consistent pace without an unreasonable number and length of rest periods, ask simple questions, request assistance, or accept instructions and respond appropriately to criticism from supervisors.  (T. 236).  In addition, Wainman-Sauda did not believe that plaintiff could deal with the stress of skilled or semi-skilled work because plaintiff's "daily life is stressful to the point where I do not believe she could work."  (T. 237).  Wainman-Sauda noted that plaintiff suffered from anxieties and phobias due to PTSD, and often would not speak or feel capable in a social setting.  (*Id*.).  As a result, Wainman-Sauda concluded that plaintiff would not be capable of interacting appropriately with the general public, maintaining socially appropriate behavior, traveling in unfamiliar places, or using public transportation.  (*Id*.).      "It is the

---

[4]  The GAF is a subjective determination based on a scale of 1 to 100 of "the clinician's judgment of the individual's overall level of functioning."  AMERICAN PSYCHIATRIC ASS'N, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 32 (Text Revision 4th ed. 2000).  A GAF score of 41-50 indicates "[s]erious symptoms . . . [or] serious impairment in social, occupational, or school functioning," such as inability to keep a job. *Id.* at 34.

responsibility of the ALJ to assess [the claimant's] residual functional capacity based on all the relevant evidence in the case record." *La Patra v. Barnhart*, 402 F. Supp. 2d 429, 432 (W.D.N.Y. 2005); *see also* 20 C.F.R. § 416.945 ("We will assess your residual functional capacity based on all the relevant evidence in your case record.").  Moreover, Social Security regulations specifically contemplate the use of medical information from "other sources," including therapists, to provide insight into the severity of plaintiff's impairments and how they affect her ability to work.  20 C.F.R. § 416.913(d).  "Opinions from these medical sources, who are not technically deemed 'acceptable medical sources' under our rules, are important and should be evaluated on key issues such as impairment severity and functional effects, along with the other relevant evidence in the file."  SSR 06-03p; *see Bono v. Massanari*, 2001 WL 1104688, at *4 (E.D.N.Y. 2001) (applying "due consideration" to treating therapist's opinion).  An "opinion from a medical source who is not an 'acceptable medical source' may outweigh the opinion of an 'acceptable medical source,' including the medical opinion of a treating source."  S.S.R. No. 06-03p (C.E. 2006); *see also* SSR 85- 16 (other source evidence "may play a vital role in the determination of the effects of impairment . . . .").

Here, the ALJ acknowledged that Wainman-Sauda "reported Post-Traumatic Stress Disorder, Depression, and Borderline Personality Disorder."  (T. 15).  In addition, the ALJ relied on Wainman-Sauda's belief that plaintiff was "capable of understanding, remembering, and carrying out short and simple instructions."  (*Id.*).  However, the ALJ made no reference to Wainman-Sauda's opinions regarding plaintiff's significant psychological limitations, and ultimately concluded that plaintiff was mentally capable of performing light work except for a moderate limitation on her "ability to understand, remember and carry out complex job instructions."  (T. 16).

In this case, the ALJ's decision contains no analysis of Wainman-Sauda's reports.  As plaintiff's longtime treating psychotherapist and the only treating source who evaluated the disabling effects of plaintiff's mental impairments, Ms. Wainman-Sauda's opinion was relevant to the ALJ's disability determination.  *See Bergman v. Sullivan*, No. 88-CV-513, 1989 WL 280264, *3 (W.D.N.Y. Aug. 7, 1989) (holding that a treating social worker is "a non-medical source whose opinion concerning the nature and degree of plaintiff's impairment is not only helpful, but critically important, since he is the only treating source."); *O'Halloran v. Barnhart*, 328 F. Supp. 2d 388, 394 (W.D.N.Y. 2004) (same).  Thus, the ALJ should have articulated why he discredited Wainman-Sauda's reports.  *See* S.S.R. No. 06-03p (stating that the factors an ALJ is required to consider when evaluating the weight to be given to a medical opinion, while not explicitly required, also can be applied to opinions of "other sources," such as therapists).  The Court therefore remands this matter to the Commissioner for evaluation of the treating therapist's opinion and its impact, if any, upon the determination of plaintiff's mental residual functional capacity.

**B.     Social Security Ruling 00-4p**

Plaintiff next argues that the ALJ erred by failing to ask the vocational expert whether his testimony was consistent with the *Dictionary of Occupational Titles* ("*DOT*").  In response, the Commissioner states that "there is no unresolved conflict between the vocational expert evidence and the *Dictionary of Occupational Titles*."  Because there are no apparent discrepancies between the evidence provided by the vocational expert and the relevant portions of the *DOT*, the Court finds that any failure to inquire about the consistency of these sources was harmless error.

In this case, the ALJ asked Vocational Expert David Festa to assume "a claimant that is 39 years of age with a 12th-grade education" who is "[c]apable of simple repetitive tasks."  (T. 290).

The hypothetical claimant would have "no physical limits to sitting, standing, walking, bending, [or] climbing" and "[m]inimal to mild limits to lifting and carrying, pushing, and pulling." (*Id*.) Mr. Festa testified that a claimant with the specified limitations would no longer able to perform her past relevant work as a daycare/nursery school attendant, which is considered "semi-skilled" and is normally performed at a light exertional level. (T. 289). However, Mr. Festa asserted that the hypothetical individual could perform alternative work in the national economy, including jobs as a cafeteria attendant or bakery racker, which are considered unskilled and normally performed at a light exertional level. (T. 290-291). According to Mr. Festa, both alternative jobs are "representative" because they involve simple, repetitive, and routine tasks. (T. 291). The ALJ ultimately relied upon this testimony at step five of his analysis, finding plaintiff "not disabled" based on her ability to perform "a significant number of jobs in the national economy" including "cafeteria attendant" and "racker." (T. 17).

Social Security Ruling ("SSR") 00-4p, requires that "[w]hen a [vocational expert] provides evidence about the requirements of a job or occupation, the adjudicator has an affirmative responsibility to ask about any possible conflict between that [vocational expert's] evidence and information provided in the *DOT*." *See also Massachi v. Astrue*, 486 F.3d 1149, 1150 (9th Cir 2007) (holding that, in light of SSR 00-4p, an ALJ may not rely on the testimony of a vocational expert regarding the requirements of a particular job without first inquiring whether such testimony conflicts with the *DOT*). However, an ALJ's failure to follow SSR 00-4p is harmless where there is no conflict between the expert's opinion and the *Dictionary of Occupational Titles*. *See Massachi*, 486 F.3d at 1154, n.9.

In the instant case, Mr. Festa testified that the jobs of cafeteria attendant and bakery racker were classified as unskilled and usually performed at a light exertional level, which is

entirely consistent with the relevant portions of the *DOT*.  *See Dictionary of Occupational Titles* 311.677-010, 524.687-018.  Furthermore, there is no apparent discrepancy between the *DOT* and the vocational expert's statement that the two specified occupations involved simple, repetitive, and routine tasks.  *Id.*  Therefore, any error arising from the ALJ's alleged failure to ask the vocational expert about possible conflicts between his testimony and the *Dictionary of Occupational Titles* was harmless, since no such conflict appears to exist.  *Renfrow v. Astrue*, 496 F.3d 918, 921 (8th Cir. 2007).

## C.      Testimony of the Vocational Expert

According to plaintiff, the ALJ asked Mr. Festa to provide an expert opinion based on the capabilities of a hypothetical claimant whose limitations did not match plaintiff's residual functional capacity as determined in the ALJ's decision.  Plaintiff consequently argues that the ALJ committed error in relying on the vocational expert's opinion when determining her ability to perform jobs in the national economy.  The Court, however, finds that any discrepancies between the hypothetical limitations and the ALJ's determination of plaintiff's residual functional capacity were inconsequential, and therefore concludes that the ALJ's reliance on the vocational expert's testimony was not legally erroneous.

At the fifth step of the sequential evaluation of disability, the Commissioner bears the responsibility of proving that plaintiff is capable of performing other jobs existing in significant numbers in the national economy in light of plaintiff's residual functional capacity, age, education, and past relevant work.  20 C.F.R. §§ 416.920, 416.960.  Ordinarily, the Commissioner meets his burden at this step "by resorting to the applicable medical vocational guidelines (the grids), 20 C.F.R. Pt. 404, Subpt. P, App. 2 (1986)."  *Bapp v. Bowen*, 802 F.2d 601, 604 (2d Cir. 1986).  Sole reliance on the grids is inappropriate where the guidelines fail to describe the full

extent of a claimant's limitations.  *Id.* at 606.  For example, use of the grids as the exclusive

framework for making a disability determination may be precluded where, as here, plaintiff's

physical limitations are combined with non-exertional impairments which further limit

the range of work she can perform.[5]  *Pratts v. Chater*, 94 F.3d 34, 39 (2d Cir. 1996).  In these

circumstances, the Commissioner must "introduce the testimony of a vocational expert (or other

similar evidence) that jobs exist in the economy which claimant can obtain and perform."  *Bapp*,

802 F.2d at 603; *see also Melchior v. Apfel*, 15 F. Supp. 2d 215, 58 (N.D.N.Y. 1998) (stating

"where nonexertional limitations significantly diminish the ability to perform a full range of

work, it is appropriate that the ALJ present testimony from a vocational expert").

 Here, the ALJ properly sought the testimony of a vocational expert because he determined

that plaintiff suffered from non-exertional limitations.  *See Bapp*, 802 F.2d at 606.  When

questioning Mr. Festa, the ALJ asked that he assume "a claimant that is 39 years of age with a

12th-grade education" who is "[c]apable of simple repetitive tasks."  (T. 290).  The hypothetical

claimant would have "no physical limits to sitting, standing, walking, bending, [or] climbing" and

"[m]inimal to mild limits to lifting and carrying, pushing, and pulling."  (*Id.*)  Mr. Festa testified

that a claimant with the specified limitations would no longer able to perform her past relevant

work as a daycare/nursery school attendant, which is considered "semi-skilled" and is normally

performed at a light exertional level.  (T. 289).  In response to further inquiries from the ALJ, Mr.

Festa asserted that the hypothetical individual could perform alternative work in the national

---

[5] An "exertional limitation" is a restriction imposed by a claimant's impairments and related symptoms which affects only plaintiff's ability to meet the strength demands of jobs, such as sitting, standing, walking, lifting, carrying, pushing, and pulling.  20 C.F.R. § 416.969a(b).  A "non-exertional limitation" is a restriction resulting from a claimant's impairments and related symptoms which affects only plaintiff's ability to meet the non-strength demands of jobs.  20 C.F.R. § 416.969a(c).  Examples of non-exertional limitations are difficulties functioning due to nervousness, anxiety, or depression, difficulties with attention and concentration, and difficulties with understanding and remembering detailed instructions.  20 C.F.R. § 416.969a(c)(i)-(iii).

economy, including jobs as a cafeteria attendant or bakery racker, which are considered unskilled and normally performed at a light exertional level.  (T. 290-291).  According to Mr. Festa, both alternative jobs are "representative" because they involve simple, repetitive, and routine tasks. (T. 291).  The ALJ ultimately relied upon this testimony at step five of his analysis, finding plaintiff "not disabled" based on her ability to perform "a significant number of jobs in the national economy" including "cafeteria attendant" and "racker."  (T. 17).

"Proper use of vocational testimony presupposes both an accurate assessment of the claimant's physical and vocational capabilities, and a consistent use of that profile by the vocational expert in determining which jobs the claimant may still perform."  *Lugo v. Chater*, 932 F. Supp. 497 (S.D.N.Y. 1996).  Plaintiff claims that the residual functional capacity determination in the ALJ's decision, which specified that plaintiff could not carry "in excess of 10 pounds frequently and 20 pounds occasionally," was different and more restrictive than the hypothetical claimant's "minimal to mild limits to lifting and carrying."  (T. 16, 290).  The *DOT* profiles for the jobs of cafeteria attendant and bakery racker, however, state that the exertional force required is limited to "up to 20 pounds of force occasionally" and "up to 10 pounds of force frequently." *Dictionary of Occupational Titles* 311.677-010, 524.687-018.  Thus, the vocational expert's assessment of jobs within the hypothetical claimant's capabilities is consistent with the ALJ's determination of plaintiff's residual functional capacity.  *See De Leon v. Secretary of Health and Human Servs.*, 734 F.2d 930, 936 (2d Cir. 1984) (vocational expert's testimony is useful provided the ALJ presents full extent of claimant's physical disabilities).

**D.    Credibility**

Plaintiff argues that the ALJ applied an incorrect legal standard in concluding that her allegations were "partially credible."  Magistrate DiBianco evaluated the ALJ's credibility

analysis, but found that the "record supports the ALJ's rejection of plaintiff's credibility even

though the ALJ did not completely analyze plaintiff's pain according to the regulations."  The

magistrate judge concluded that "any error that the ALJ made in this regard is harmless," and

recommended that the Court dismiss plaintiff's complaint.  Plaintiff objects to this conclusion.

     An ALJ is not required to accept a claimant's testimony without question.  *Marcus v.

Califano*, 615 F.2d 23, 27 (2d Cir. 1979).  Instead, the ALJ "has discretion to evaluate the

credibility of the claimant and to arrive at an independent judgment, in light of the medical

findings and other evidence, regarding the true extent of the [allegations]."  *Brandon v. Bowen*,

666 F. Supp. 604, 608 (S.D.N.Y. 1987).  Nevertheless, if the ALJ decides to reject plaintiff's

testimony, "he must do so explicitly and with sufficient specificity to enable the Court to decide

whether there are legitimate reasons for the ALJ's disbelief."  *Id.*

     In evaluating plaintiff's impairments and determining her residual functional capacity, the

ALJ stated that he found plaintiff's allegations to be "partially credible."  (T. 15).  However, the

ALJ did not set forth the aspects of plaintiff's allegations that he found to be credible, nor did he

identify the allegations deemed less than fully credible.  The ALJ's determination of partial

credibility therefore lacks the specificity required to determine its validity.  *See Williams ex rel.

Williams v. Bowen*, 859 F.2d 255 (2d Cir 1988) ("A finding that the witness is not credible must

nevertheless be set forth with sufficient specificity to permit intelligible plenary review of the

record.").

     Moreover, the ALJ did not state the reasons for the credibility determination in this case.

It is well settled that the ALJ's decision "must contain specific reasons for the finding on

credibility, supported by the evidence in the case record, and must . . . make clear to the

individual and to any subsequent reviewers the weight the adjudicator gave to the individual's

statements and the reasons for that weight."  Social Security Ruling 96-7p; *see also Murphy v. Barnhart*, 2003 U.S. Dist. LEXIS 6988, at *30 (S.D.N.Y. 2003) ("In assessing the claimant's credibility, the ALJ must consider all of the evidence in the record and give specific reasons for the weight accorded to the claimant's testimony.").  Absent such findings, remand is required. *Miller v. Shalala*, 894 F. Supp. 73, 75 (N.D.N.Y. 1995); *see also Knapp v. Apfel*, 11 F. Supp. 2d 235, 238 (N.D.N.Y. 1998) ("a finding that the Commissioner has failed to specify the basis for his conclusions is [a] compelling cause for remand").

Here, the ALJ provided a summary of plaintiff's testimony regarding her living conditions, her daily activities, and her estimation "that she can stand for 45 minutes, sit for 30 minutes, walk for 10 minutes, and lift 20 pound[s]" in support of his conclusion that plaintiff's testimony was partially credible.  (T. 15).  The ALJ did not, however, explain why or how this testimony served to partially discredit plaintiff's allegations.  Thus, the Court has no basis upon which to determine whether the appropriate legal standards were applied, or evaluate whether the ALJ considered the entire evidentiary record in arriving at his conclusion.  As a result, the Court remands this case for a determination of plaintiff's credibility which must contain specific findings based upon substantial evidence.  *See Harrison v. Secretary of Health and Human Services*, 901 F. Supp. 749, 757 (S.D.N.Y. 1995) (remanding for elaboration on ALJ's credibility determination).

## VI.    Conclusion

For the foregoing reasons, it is hereby

ORDERED that the Report and Recommendation is rejected to the extent it recommends a conclusion that the ALJ properly evaluated the medical opinions of the evidence from plaintiff's therapist; and it is further

ORDERED that the Report and Recommendation is rejected to the extent that it recommends a conclusion that the ALJ engaged in the proper legal analysis of plaintiff's credibility; and it is further

ORDERED that the Report and Recommendation is otherwise accepted in its entirety; and it is further

ORDERED that this matter is remanded to the Commissioner for further proceedings consistent with this Memorandum-Decision and Order

IT IS SO ORDERED.

March 10, 2008
Syracuse, New York

_____
Norman A. Mordue
Chief United States District Court Judge

22